## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| FARMER FRESH PRODUCE INTERNATIONAL, LLC, ) ) ) | |
| Plaintiff – Counter Defendant, ) | |
| vs. ) | CIVIL NO. 10-00269-CG-B |
| PGD PROPERTIES, LLC, et al, ) | |
| Defendants – Counter Claimants. ) | |

## ORDER

This matter came before the court on June 20 and 21, 2011, for a bench trial, and on July 5, 2011, on the motion of the plaintiff, Farmer Fresh Produce International, LLC ("Farmer Fresh" or "the plaintiff") for leave to amend its complaint to add an additional fraud count ("Count Four").  (Doc. 45-1).

## ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

Farmer Fresh's complaint alleges two counts of breach of contract and one count of fraud, all stemming from a dispute over a written contract titled the "Working Agreement."  See Doc. 1. The new Count Four would add an additional fraud count by alleging the following: (1) that in the course of negotiating the Working Agreement, Farmer Fresh refused to sign it unless the defendants, PGD Properties, LLC ("PGD"), Jeff Parr, Leonard Gilbert, and Warren Day ("PGD", or "the defendants") agreed to personally guarantee the repayment of a $225,000 loan

1

from Farmer Fresh to the defendants; (2) that the defendants drafted a Working Agreement that contained such a personal guaranty and presented it to the plaintiff; (3) that Farmer Fresh signed the Working Agreement in reliance on the personal guaranty; (4) that the defendants understood the nature and effect of a personal guaranty but never intended to be bound by it; (5) that the defendants knowingly made false representations to Farmer Fresh regarding the personal guaranty; and (6) that Farmer Fresh suffered damages as a proximate cause of these false representations.

There is a strong policy embodied in the Federal Rules of Civil Procedure, and Rule 15 particularly, favoring the liberality of amendment. Borden, Inc. v. Florida E. Coast Ry. Co., 772 F.2d 750, 757-58 (11th Cir. 1985) (citing Wallin v. Fuller, 476 F.2d 1204, 1209 (5th Cir. 1973); United States v. Stephen Brothers Line, 384 F.2d 118, 124-25 (5th Cir. 1967)). Rule 15(b) of the Federal Rules of Civil Procedure states in part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Allowing an amendment to the pleadings at the close of trial to conform to the evidence presented is within the trial court's discretion.  See, e.g., Borden (citing Save Lake Washington v. Frank, 641 F.2d 1330, 1340 (9th Cir. 1981); Fisher v. Indiana Lumbermens Mutual Insurance Co., 456 F.2d 1396, 1398-99 (5th Cir.

1972)).  When issues outside the pleadings are tried by the express or implied

consent of the parties, however, Rule 15(b) requires that the amendment be

allowed.  <u>Wallin</u>, 476 F.2d at 1210.

Here, the issue of fraud as it pertained to the personal guaranty contained in

Section 1.D. of the Working Agreement falls outside of the Court's Pretrial Order

(Doc. 40).  Nevertheless, defendants Gilbert, Parr, and Day testified at length

during the trial about whether they intended to be bound by the personal guaranty.

 Defense counsel did not object to this line of questioning, and therefore

impliedly consented to the trial of this issue despite the fact that it was outside of

the Pretrial Order.  Accordingly, the plaintiff's motion is **GRANTED**.


## ORDER ON BENCH TRIAL

The court has considered the testimony of the witnesses, the exhibits

introduced into evidence, and the arguments of counsel.  The court makes the

following findings:

### FINDINGS OF FACT

Farmer Fresh is a Mississippi limited liability company involved in the food

distribution business.  The owner and president of Farmer Fresh is Carl Boyanton.

PGD is a Florida limited liability company doing business in Mobile, Alabama.

Defendants Jeff Parr, Leonard Gilbert, and Warren Day, are the three members of

PGD.  At all relevant times, PGD owned a warehouse located at 600 Fisher Street

in Mobile (the "warehouse").  The warehouse contained space for refrigerated,

frozen, and dry storage. PGD had been operating a food storage and distribution service out of the warehouse, and for a time also operated a small store there. In the summer of 2008, after losing some business, PGD shut down both the warehouse and the store. By late 2008, PGD was having difficulty making mortgage and other payments related to the warehouse. PGD had been advised by First Bank & Trust of Mississippi ("FB&T") that if an arrearage payment of nearly $124,000.00 was not made by December 31, 2008, then the bank would begin foreclosure proceedings on the property.

The members of PGD learned that Boyanton might be looking for warehouse space in Mobile, and approached him about becoming a member of PGD or perhaps buying the warehouse from them in order to prevent a default under the mortgage. On December 10, 2008, Boyanton and the three members of PGD drafted and signed a letter indicating that the parties were in the process of negotiating a sale or lease of the property. A copy of the letter was sent to FB&T.

On December 31, 2008, Boyanton paid the sum of $123,902.37 to FB&T in order to prevent the bank from foreclosing on the mortgage. The parties then began drafting a working agreement between PGD and Farmer Fresh (the "Working Agreement"). Various drafts of the Working Agreement were prepared by Day and submitted to Boyanton for approval. Boyanton would then respond to Day with his desired changes to the draft. The early drafts of the Working Agreement did not contain any language pertaining to a personal guaranty. Boyanton demanded that the Working Agreement include the personal guaranties of Parr, Gilbert, and Day

4

for any amount that he loaned.

The parties signed the final draft of the Working Agreement on January 19, 2009.  It provided that Boyanton would loan PGD the total sum of $225,000.00.  This amount specifically included the $123,902.37 that Boyanton had previously paid to FB&T on December 31, 2008, and required Boyanton to pay the remaining $101,097.63 to PGD on January 20, 2009, which he did.  Paragraph 3 of the Working Agreement provided that:

> The basis for this agreement is a working partnership between Carl Boyanton, Jeff Parr, Leonard Gilbert and Warren Day, whereby each of the individuals work together to help grow the business of Farmer Fresh Produce Int. LLC.  The incremental increase in business brought to Farmer Fresh Produce Int. LLC will be applied to the $225,000 debt owed by Jeff Parr, Leonard Gilbert and Warren Day.

The Working Agreement further provided that Farmer Fresh would lease the warehouse from PGD pursuant to a signed lease agreement (the "Lease") which was attached to the Working Agreement.  The term of the Lease was 24 months beginning January 1, 2009, with an automatic extension of 12 months unless one party provided 60 days advance notice of its intent to decline the extension.  The Working Agreement also provided at paragraph 1.C that "[t]he 225,000 total, without interest, to be repaid solely from all cold storage fees and the gross profit on sales."  It  also states at paragraph 1.D. that "Jeff Parr, Leonard Gilbert and Warren Day agree to personally guaranty the repayment of any portion of the $225,000 not paid by all cold storage fees and the gross profit on sales."  Gilbert stated that the members of PGD did not intend to be bound by the personal

guaranty language in the Working Agreement, and actually changed the wording of those paragraphs in an attempt to avoid personal liability.  Parr and Gilbert testified that they had no intention to personally guaranty the repayment of the $225,000.00 at the time they signed the Working Agreement.  They both said that their intention was to sign a personal guaranty at some point in the future provided there was a deficit between the original loan amount and the amount generated by cold storage fees and gross profit on sales.  On the other hand, Day testified that he intended to be bound by the personal guaranty.

The Working Agreement gave Boyanton the option, during the Lease term, of buying into, or buying all of, PGD.  The Working Agreement and Lease both state that Boyanton and Farmer Fresh accept the warehouse in its "as-is" and "where-is" condition.  However, the Lease provided at 14.(a) that "[t]enant shall renovate and repair the existing building as agreed between the parties and deemed appropriate in order to conduct its business."   After signing the Working Agreement and Lease, Boyanton proceeded to make repairs to the warehouse, including cleaning, painting, repairing roof leaks, and repairing the building's refrigeration and freezer systems, as well as the electrical system.  It was Boyanton's understanding of the Lease that Farmer Fresh was obligated to bring the building up to a standard whereby the company could use it as a produce and frozen food warehouse.

The Working Agreement does not contain any term regarding its duration.  Parr testified that he believed that the parties would have longer than the two year initial lease term to generate an increase in the gross profit of Farmer Fresh as well

as cold storage fees in order to recover the initial $225,000.00 loan.

Neither party conducted an inventory of the warehouse contents before Farmer Fresh's lease commenced.  However, the parties agree that prior to its occupation by Farmer Fresh, the warehouse had been vandalized, and copper tubing for those refrigeration and freezer systems had been cut and stolen. Electrical wiring was also taken.  Because this damage was covered under PGD's property insurance, Farmer Fresh and PGD agreed orally that Farmer Fresh would pursue the claim on behalf of PGD and that PGD would reimburse Farmer Fresh for the cost of those repairs out of the insurance proceeds.  PGD was paid a total of $80,403.57 on the insurance claim negotiated by Boyanton.  Of that amount, PGD paid over to Farmer Fresh $13,060.11 which was the amount of the first insurance check received by PGD under the claim.

Farmer Fresh made all required lease payments from January through September 2009.  It then withheld three monthly payments, due for October through December 2009, in an attempt to recoup the vandalism repair costs not reimbursed by PGD.  A total of $30,522.45 in rent was withheld.  Beginning in January 2010, Farmer Fresh resumed making monthly lease payments again, which payments were accepted by PGD.  The total rent paid by Farmer Fresh was $178,227.45.  This amount is in addition to the $225,000.00 loan from Farmer Fresh to PGD.

On June 17, 2009, an appraisal of the warehouse property was prepared.  The appraisal indicated that the value of the property was $1,263,000.00.  The appraisal

notably did not include a value for the refrigeration equipment on the property. PGD produced at trial an undated appraisal estimating the value of this equipment at $112,100.00.[1]  Thereafter, Boyanton made an offer to PGD to purchase the property for $1,250,000.00.  PGD either rejected or failed to respond to the offer.

North 30 Food Sales ("North 30") is or was a company owned by Parr.  North 30 stored frozen food products at the warehouse during the lease and paid storage fees of $2,500 per month to do this.

W.D. Foods, a company owned by Day, also stored refrigerated foods at the warehouse.  These foods included bulk sausage.  During this time, Greer's Market, a grocery store chain that bought food from W.D. Foods, complained on several occasions of moldy sausage.  As a result, Greer's ceased buying sausage products from W.D. Foods.  Boyanton testified that he believed the mold problem was caused when the sausage was stored near fresh produce generating excess moisture. James Crenshaw, Farmer Fresh's general manager through the middle of 2009, opined that this problem was caused by the failure of Farmer Fresh employees to properly rotate the products in stock.

Parr testified that on occasion North 30 would utilize a Farmer Fresh truck to deliver frozen products.  He said that if his company had to deliver to more than one location, the products would begin breaking down and would be unmarketable.

There was also testimony about an occasion on a Friday when Day discovered

---

[1] The appraisal is part of Defendants' Exhibit 6 and includes values for other equipment as well.  The $112,100 figure represents the values for the motor house, compressors and freezer and medium temperature storage units.

that the temperature in the warehouse freezer had risen to 28 or 29 degrees.  Had that condition continued to exist, the freezer temperature would have been well above freezing by the following Monday and the food in the freezer would have been ruined.  Day testified that there were two additional times in which he discovered high temperatures in the freezer.

There was testimony received regarding the operations of Farmer Fresh during the term of the lease.  Eddie Etheridge, the general manager of Farmer Fresh from October 2009 to December 2010, said that Farmer Fresh had serious difficulties in delivering frozen products to customers.  This was because the company's trucks could not maintain a proper temperature for frozen goods.  In Etheridge's opinion, Farmer Fresh did not have the ability to handle frozen foods in a safe and professional manner.  He said that during his time with the company, Farmer Fresh lost approximately 50% of its customers due to refrigeration and delivery issues, along with quality and payment problems.  Nevertheless, on July 30, 2009, Farmer Fresh and the warehouse were inspected by PrimusLabs.com, a food safety inspection.  Farmer Fresh received a score of 98% which corresponds to a rating of "superior."

On August 31, 2010, Farmer Fresh shut down the freezer it had been using to store frozen foods.  As a result, North 30 had to find a new facility to store its frozen product.  According to Boyanton, he did this because, with North 30 as the only paying frozen food customer, Farmer Fresh was operating the freezer at a loss of approximately $3,000.00 a month.  Prior to the shut down, North 30 offered to

increase its monthly payments from $2,500 to $3,500 per month.

The initial 24 month lease term expired on December 31, 2010. In January 2011, Farmer Fresh moved out of the warehouse and into a facility in Baldwin County. After the departure of Farmer Fresh, the warehouse was again vandalized.

According to the business records of Farmer Fresh, the company generated a gross profit of $902,202.16 in 2009. In 2010, the figure fell to $881,360.87. For both years, Farmer Fresh operated at a net loss. Boyanton testified that "gross profit" as used in the working agreement was calculated by taking the income from sales and subtracting the cost of products sold plus delivery costs. The PGD defendants, on the other hand defined the figure without the delivery deduction.

PGD claimed that when it retook possession of the warehouse at the end of the Lease term, it discovered that the property had sustained damage during the tenancy of Farmer Fresh. Specifically, it claimed that the two load levelers used at the warehouse dock to facilitate the loading of delivery trucks were no longer in working condition. PGD also claimed that the dock pads used to provide a buffer between the loading dock and delivery trucks had been destroyed, as had an electric door. Other damage to the warehouse claimed by PGD included a lost compressor, inoperable roll up doors, potholes in the parking lot, plumbing problems, damage to steel posts outside of the warehouse, and damage to the  fence surrounding the property as well as the rolling gate that granted access. See Defendants' Ex. #14.

PGD also asserted that some of its equipment utilized in the operation of the warehouse was missing at the end of the lease. Most significantly, PGD claimed

that some of the metal racking used to store pallets of frozen goods had been removed from the property by Farmer Fresh. Additionally, a ladder, manual pallet jack, and dock ramp could also not be located. Day testified that he saw those items in the warehouse during the time Farmer Fresh was in the process of moving out. Finally, incandescent lighting had been removed. Eddie Etheridge, former general manager for Farmer Fresh, testified that he had delivered this lighting from the warehouse to Farmer Fresh's new facility in Baldwin County.

## CONCLUSIONS OF LAW

## I.   FARMER FRESH'S COMPLAINT

### A.   COUNT ONE:   Breach of Contract (Personal Guaranty)

Count One of Farmer Fresh's complaint alleges that Parr, Gilbert, and Day breached the Working Agreement by failing to honor the personal guaranty contained in Paragraph 1.D. (Doc. 1, p. 5).

Under Alabama law, the elements of a breach of contract claim are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. Reynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala. 2002) (citing State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 303 (Ala. 1999). As to the first element, the court finds that the personal guaranty is valid and enforceable. Regardless of the subjective intent of the individual defendants, the unambiguous language of the Working Agreement indicates that these defendants are bound by their agreement to "personally guaranty the repayment of any portion of the $225,000 not paid by all cold storage

11

fees and the gross profit on sales." See Plaintiff's Ex. # 4, p. 1, ¶ 1.D. The defendants argue that they only signed the Working Agreement, and hence the guaranty, solely as members of PGD, and therefore cannot be held personally liable for the $225,000. (Doc. 44, p. 5). In making this argument, however, the defendants did not cite any case law in support. See id. This is a glaring omission, and one which is compounded by case law stating the opposite point, namely, that "guarantors cannot defeat the plain terms of the agreement by saying that they did not intend to obligate themselves to the provisions of the written guaranty agreement." Williams v. Bank of Oxford, 523 So.2d 367, 371 (Ala. 1988).

As to the second element, the court finds that Farmer Fresh performed its obligations under Paragraph 1 of the Working Agreement when it loaned PGD the $225,000.00. The court heard trial testimony from Boyanton, Gilbert and Day, each of whom stated that Boyanton paid $123,902.37 to FB&T on December 31, 2008. Boyanton also testified, and the defendants do not dispute, that he made a second payment of $101,097.63, as required by Paragraph 1 of the Working Agreement. See Plaintiff's Ex. #2, ¶2.

As to the third element, the court finds that the defendants did not perform their obligations under the Working Agreement because they failed to repay the $225,000.00 loan. Arriving at this conclusion was complicated by the fact that the operative provisions at issue here, Paragraphs 1.C and 1.D, are vague and poorly drafted. While the parties agreed that the $225,000.00 loan would be repaid "from all cold storage fees and the gross profit on sales," the parties neglected to define the

parameters of "gross profit on sales." In their post-trial brief, the defendants

attempt to exploit this oversight by arguing that "the gross profits for [Farmer

Fresh] greatly exceeded the sum of $250,000.00 … during the term of the Working

Agreement," and claim that "there are no additional amounts that remain to be paid

such that the 'personal guaranty' would be operational." (Doc. 44, p. 5). The

defendants cited no record evidence for this assertion, but presumably are referring

to the fact that Farmer Fresh saw gross profits of $902,202.16 and $881,360.17 in

2009 and 2010, respectively, which "greatly exceed[s]" $250,000. See id.

This argument must fail because the defendants cited no portion of the

Working Agreement, nor any record evidence, to establish their interpretation of

the term "gross profits on sales" (i.e., Farmer Fresh's gross profits from across all of

its business activities rather than just the warehouse) to be the intent of the

parties. See Doc. 44, p. 5. In fact, the court's reading of the Working Agreement

suggests the opposite. The Working Agreement, despite its flaws, does clearly

express that the parties intended to enter into a contractual relationship that was

centered upon the warehouse at 600 Fisher Street, and the Working Agreement

contains no reference to gross profits generated through ventures other than the

warehouse. See, e.g., Plaintiff's Ex. #1; Defendant's Ex. #2, p. 3; Plaintiff's Ex. #4.

It is a cardinal rule of contractual interpretation that the parties' language will be

deemed conclusively indicative of their intentions where it is reasonably susceptible

of only one interpretation. 1 Richard A. Lord, Williston on Contracts, § 32:2 (4th ed.

1999). Here, the court finds that the exclusive reference to gross profits in the

context of the operation of the warehouse renders the Working Agreement susceptible of only one interpretation – that the parties intended for the $225,000.00 loan to be repaid from profits generated by the warehouse alone, and not by Farmer Fresh's other operations.

The defendants argue separately that Farmer Fresh cannot establish their nonperformance because the Working Agreement provides for no specific duration or term.  (Doc. 44, p. 5).  This argument fails, as well.  Where a contractual obligation to perform exists and no time is prescribed in the contract for performance, the law requires the obligated party to perform within a "reasonable time."  Lemon v. Golf Terrace Owners Ass'n, 611 So.2d 263, 265 (Ala. 1992).  "What is a reasonable time depends on the nature of the act to be done and all of the circumstances relating to that act."  Id.  As an integral part of the Working Agreement, Farmer Fresh was obligated to rent the warehouse from PGD according to the terms of the attached Lease.  See Plaintiff's Ex. #4.  The term of the Lease was for two years, with a provision for a 12 month extension if neither party rejected the extension.  See Defendants' Ex. #4, ¶3.  Under these circumstances, the court finds that a reasonable time for the performance of the Working Agreement is the two year term of the Lease, meaning that the defendants had until January 19, 2011 to perform under the Working Agreement.

This brings the inquiry to the fourth element of Farmer Fresh's breach of contract claim, damages.  There is no dispute that neither Parr, Gilbert, nor Day has paid Farmer Fresh anything pursuant to the personal guaranty.  Therefore, the

question becomes whether or not Farmer Fresh proved at trial what, if anything, was due under the guaranty. Boyanton testified at trial that he did not recoup any of the $225,000 loan. He then undercut this testimony somewhat when he stated that Parr's company, North 30, paid Farmer Fresh $2,500 per month in cold storage fees until Boyanton "shut the freezer down" in August of 2010 due to high utility expenses. Boyanton thereby admitted that he prevented North 30 from storing product at the warehouse and paying additional cold storage fees for the months of September through December 2010 -- the last four months of the two-year term of the Lease. Boyanton also testified that neither Farmer Fresh nor the defendants were successful in generating any additional cold storage fees. Finally, Boyanton testified that there was no gross profit generated on any sales from the warehouse, and that in fact the sales of product from the warehouse generated losses.

Farmer Fresh has entered into evidence a check register indicating that North 30 paid $32,194.04 in cold storage fees from August 2009 until August 2010. See Plaintiff's Ex. #12. Furthermore, Boyanton's own testimony establishes that Farmer Fresh would have continued to receive $2,500 per month in cold storage fees from North 30 for four more months if Boyanton had not closed the warehouse to cold storage. Thus, Farmer Fresh refused $10,000.00 in cold storage fees that North 30 was willing to pay. The court finds that these amounts, totaling $42,194.04 should be deducted from the $225,000.00 owed under the personal guaranty.

In their post-trial brief, the defendants urge the court to apply the doctrine of

15

unclean hands and rule that Farmer Fresh is not entitled to any relief on Count One because "Farmer Fresh was never able to handle frozen products correctly and … without product contamination occurring." (Doc. 44, p. 6). The thrust of defendants argument appears to be that the failure of the parties to generate gross profits on sales was a result of Farmer Fresh's poor handling of frozen products.

The court declines to apply the doctrine of unclean hands to this count because Alabama precedent indicates that "the maxim refers to willful misconduct rather than merely negligent misconduct and must be morally reprehensible as to known facts." Weaver v. Pool, 249 Ala. 644, 648 (1947). Here, the defendants have alleged that Farmer Fresh "was never able to handle frozen products," (Doc. 44, p. 6), but did not allege that Farmer Fresh willfully mishandled them. Nor does the inability to handle frozen products qualify as "morally reprehensible" under the court's understanding of the term. Although the defendants do make a vague passing allegation of perjury on Boyanton's part, id., they do not specify what statement or representation he made in his testimony that was false, and provide no evidence of a falsehood. Thus, doctrine of unclean hands is inapplicable.

Accordingly, the court finds for Farmer Fresh on Count One. Under the terms of the Working Agreement, the defendants owe Farmer Fresh $182,805.96, representing $225,000.00 minus cold storage fees of $42,194.04.

### B.    COUNT TWO:  Breach of Contract (Purchase Offer)

The complaint also alleges that PGD breached the working agreement when it refused Farmer Fresh's offer to buy the warehouse property. Paragraph 5 of the

Working Agreement states that Boyanton has the option, during the term of the lease, to buy into PGD or to buy all of the company.  The parties agree that PGD is the warehouse property, such that buying all of PGD means buying the warehouse. Paragraph 5 goes on to say that the sale price of the warehouse would "be based on a current certified appraisal of the property at [sic] time of purchase, less the amount of initial capital improvements, but no less than the total amount of the current debt to the First Bank & Trust of Mississippi."  Boyanton offered to buy the warehouse property for $1,250,000.00 in the summer of 2009.  This offer was not accepted by PGD.  No reason for the rejection was given at trial.

The court finds that Farmer Fresh has failed to prove a breach of this term of the Working Agreement.  First, there was no evidence presented as to the value of capital improvements to the property, if any, claimed by Boyanton.  Without such information, it is impossible to determine what was to be deducted from the appraisal amount to arrive at a sale price.  Secondly, Farmer Fresh presented no evidence regarding the balance of PGD's mortgage with FB&T.  Without that number, this court cannot make a determination as to whether Boyanton's offer exceeded the balance.  Finally the property appraisal did not attribute any value to the refrigeration equipment on site, and is not therefore an accurate appraisal.  For these reasons, Count Two must fail, and is hereby **DENIED**.[2]

---

[2] Even were the court to find that Boyanton's offer complied with the Working Agreement, Count Two still fails because Farmer Fresh presented no evidence as to any damages flowing from a breach of this term. Farmer Fresh asked only for monetary damages in this count, but failed to connect any monetary losses to its failure to purchase the property at $1,250,000.00. No specific performance was

### C.       COUNT THREE: Fraud (Insurance Claim)

Farmer Fresh accuses PGD of fraud in Count Three of its complaint, arising from the repairs it made to the warehouse.  (Doc. 1, p. 6).  Specifically, Farmer Fresh claims that it was defrauded when defendants told Farmer Fresh that they would reimburse it for repairs made to the electrical and refrigeration systems necessitated by vandalism to the building.  Relying on this promise, Farmer Fresh says it spent $74,540.23 in renovating and repairing these systems, see Plaintiff's Ex. # 5, but was only reimbursed $13,000.00.  In addition to recovery of the unreimbursed costs of repairs, Farmer Fresh asks for punitive damages because it asserts that the fraud was intentional.

The elements of fraud are: (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation.  Robinson v. Sovran Acquisition Ltd. P'ship, 2011 WL 480032 *4 (Ala.Civ.App. Feb. 11, 2011) (citing Coastal Concrete Co. v. Patterson, 503 So.2d 824, 826 (Ala. 1987).  If, as here, the fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive.  Id.  "In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it."  Id. (quoting Spring Hill Lighting & Supply

demanded.

<u>Co. v. Square D Co.</u>, 662 So.2d 1141, 1149 (Ala. 1995)).

This fraud count fails for lack of proof.  Farmer Fresh presented no evidence as to the intent of any of the defendants at the time the agreement to make repairs was made.  Under Alabama law, the simple fact that the defendants may not have performed according to the agreement may be proof of a breach of contract, but without more, cannot support a promissory fraud claim.  <u>Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank</u>, 703 F.2d 1361, 1370 (11th Cir. 1983) ("[f]ailure to perform a promise is not of itself adequate evidence of intent to support an action for fraud"). <u>Glenn Const. Co., LLC v. Bell Aerospace Servs., Inc.</u>, 2011 WL 1899330 *12 (M.D. Ala. May 19, 2011) (<u>citing</u> <u>Scott v. United of Omaha Life Ins. Co.</u>, 749 F.Supp. 1089, 1093 (M.D. Ala. 1990) (the mere failure to fulfill the promise is insufficient to establish an intent to deceive).  Accordingly, Count Three is **DENIED**.

### D.   COUNT FOUR: Fraud (Personal Guaranty)

In Count Four of the complaint, Farmer Fresh alleges that the individual defendants committed fraud by signing the Working Agreement with the specific intent not to honor the personal guaranty contained in Paragraph 1.D, pointing to Parr's and Gilbert's testimony as evidence of an intent to deceive. (Doc. 45).

Indeed, Parr and Gilbert both testified that they had no intent to be personally bound by the guaranty and stated that their actual intent was to execute a personal guaranty at some future point, provided that Farmer Fresh came to them and showed them that there was a balance remaining between the original $225,000.00 loan and the amount recovered by Farmer Fresh from cold storage fees

and gross profits on sales.  Ordinarily, this testimony would constitute evidence of an intent to deceive.  However, the problem here is that the court simply does not believe Parr and Gilbert.  The notion that each man really thought he was agreeing to enter into a further agreement at some future point is not credible on its face, given the plain language of Paragraph 1.D.  Rather, it is the determination of this court, acting as the sole fact-finder, that Parr and Gilbert were lying about their true intent in order to avoid admitting to their nonperformance on the personal guaranty, and thereby admitting to a breach of contract.  Accordingly, the court finds that this testimony does not comprise credible evidence of fraud.

The court also notes that Day, who actually drafted the Working Agreement, testified that he knew that it contained a personal guaranty when he signed it in January 2009 and intended to be bound by it.  Farmer Fresh was unable to counter this testimony.  Therefore, there is no indication that Day committed fraud.

Accordingly, based upon the foregoing facts and conclusions of law, Count Four is **DENIED**.

## II.    DEFENDANTS' COUNTERCLAIM

### A.    COUNT ONE: Breach of Contract (Working Agreement)

The defendants claim that Farmer Fresh breached the Working Agreement by (1) failing to have the proper vehicles available to professionally deliver products to customers; (2) not having a sufficient and adequate sales staff;  and (3) failing to make a proper accounting of its gross profits to enable a determination to be made of the portion of the $225,000.00 loan that remained outstanding.  (Doc. 23, pp. 2-3).

As stated, supra, under Alabama law, the elements of a breach of contract claim are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. Reynolds Metals Co. v. Hill, 825 So.2d 100, 105 (Ala. 2002) (citing State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 303 (Ala. 1999).

As to the first element of defendant's breach of contract claim, the court finds that Paragraph 3 of the Working Agreement was a valid contractual provision binding Farmer Fresh and the defendants.

As to the second and third elements, performance and nonperformance, the court has divided the defendants' claim into three distinct allegations (as reflected in the counterclaim, see Doc. 23 at 3):

### (1)   Alleged Failure To Have Proper Delivery Vehicles (Paragraph 3.D)

Farmer Fresh did not contest PGD's performance under Paragraph 3.D in its post-trial brief. See Doc. 43. The court declines to sift through the trial transcript in order to make such an argument for Farmer Fresh. See Carolina Acquisition, LLC v. Double Billed, LLC, 627 F.Supp.2d 1337, 1340 (S.D. Fla. 2009) ("Federal Judges are not archaeologists.") (quoting DeSilva v. DiLeonardi, 181 F.3d 865, 867 (7th Cir. 1999). Accordingly, the court finds that the second element, performance by the counter-plaintiff, is satisfied by virtue of Farmer Fresh's silence on the matter.

As to the nonperformance element of PGD's claim, the court finds that Farmer Fresh did breach the Working Agreement by not providing adequate

21

delivery trucks to professionally service its customers.  The testimony at trial established that much of the difficulty experienced by Farmer Fresh in its performance of the Working Agreement was due to delivery problems.  Those problems, in significant part, were caused by using delivery trucks that simply were not up to the job of delivering frozen foods.  Farmer Fresh agreed in the working agreement to "deliver all products in a safe and professional manner . . . ."  Plaintiff's Ex. #4, ¶ 3.D.  This it did not do, and such failure constitutes nonperformance by Farmer Fresh in breach of the Working Agreement.

### (2)   Alleged Failure To Have An Adequate Sales Force (Paragraph 3.C)

On the other hand, the court finds that the defendants failed to prove their allegation that Farmer Fresh did not have an adequate sales force in place to perform under the Working Agreement.  The facts adduced at trial indicate that all parties made efforts to develop business for Farmer Fresh.  Most potential customers simply did not want to work with Farmer Fresh as a supplier, either because they did not want to change their current supplier, or because they had had a previous negative experience with Farmer Fresh.  In addition, there was no testimony about what a sufficient and adequate sales force should look like, or the efforts such a force should undertake.

### (3)   Alleged Failure to Account For Gross Profits

Also, the defendants' allegation that Farmer Fresh did not adequately account for its gross profits must also fail, because the Working Agreement does not contain an affirmative obligation on the part of Farmer Fresh to do so.  The

defendants were free to include such a term in the Working Agreement, but did not. The most straightforward interpretation of the Working Agreement would be that it requires some kind of accounting of Farmer Fresh's gross profits only as a condition precedent to making a claim for the balance of the $225,000.00 loan by Farmer Fresh, and not as an independent contractual obligation.  Therefore, the allegation, even if true, does not constitute nonperformance, and accordingly cannot support a claim for breach of contract.

As this court has found that Farmer Fresh breached at least one term of the working agreement, it must determine what damages, if any are recoverable by the defendants.  In their counterclaim, the defendants seek damages in the form of "the loss of income that could have been generated from the sales of fresh and frozen products had the Plaintiff not breached the Working Agreement." (Doc. 23, p. 3).  At trial, however, there was absolutely no evidence that even mentioned loss of income, much less quantified any such losses.  The same can be said for the defendants' claim for damage to their reputations.  The defendants simply chose not to present any evidence that would relate to reputation injury, or how such damage should be compensated.

The defendants also seek attorney's fees as part of their damages.  In Alabama and most other jurisdictions, the general rule is that attorney's fees and expenses of litigation are not recoverable as damages, in the absence of a contractual or statutory duty, other than by a few recognized equity principles. Tolar Const., LLC v. Kean Elec. Co., Inc., 944 So.2d 138, 152 (Ala. 2006) (citing Ex

parte Burnham, Klinefelter, Halsey, Jones & Cater, P.C., 674 So.2d 1287, 1290 (Ala. 1995)).  The Working Agreement contains no such provision regarding attorney's fees.  And the defendants have not directed this court's attention to any statute or equitable principle which would permit the imposition of attorney's fees in this case.

Accordingly, the court finds that the defendants have not proven damages and, therefore, Count One of their counterclaim is **DENIED**.

### B.    COUNT TWO: Breach of Contract (Lease)

Next, the defendants allege that Farmer Fresh breached the warehouse lease by failing to make three lease payments, and by not properly maintaining the property.  (Doc. 23 at 4).  The court will address these two allegations separately, but as an initial matter, the court finds that the first element of Count Two has been satisfied because the Lease constitutes a valid and enforceable contract between Farmer Fresh and PGD.  See Defendants' Ex. #4.

### (1)    Failure to Make Timely Payments

 Both the performance and nonperformance elements of PGD's breach of contract counterclaim have also been met.  Farmer Fresh does not dispute that PGD performed under the Lease by turning the warehouse over for its use and quiet enjoyment.  See Doc. 43 at 12.  It is also undisputed that Farmer Fresh did not make the rent payments required by the Lease for October, November, and December 2009, as PGD alleges.  Boyanton testified at trial to this fact, stating that he withheld three lease payments because the defendants did not perform on their promise to reimburse him for repairing damage to the warehouse caused by

vandalism.  In other words, Farmer Fresh admits to breaching the Lease in response to, and to recover damages for, PGD's alleged breach of a separate and independent agreement to reimburse repair costs with insurance proceeds.  Yet Farmer Fresh has cited no legal rule or precedent that permits it to do this, and the court is neither obligated nor inclined to construct arguments that Farmer Fresh has failed to raise and that are not reasonably presented in the court file.  See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it ...."); see also Bowden ex rel. Bowden v. Wal-Mart Stores, Inc., 124 F.Supp.2d 1228, 1236 (M.D. Ala. 2000) ("It is not for the court to manufacture arguments on Plaintiff's behalf.").  Moreover, even if PGD had breached a term of the Lease (as opposed to a separate agreement on reimbursement for repairs), Farmer Fresh was not entitled withhold rent – it was entitled to terminate the Lease, upon written notice and an opportunity to cure.  Defendants' Ex. 4, p. 4, ¶15(a).  Failing that, its only option was to sue for damages.

Finally, as to the damages element, the defendants have established their damages through trial testimony which showed that Farmer Fresh withheld three Lease payments in October, November, and December 2009.  The amount of the withheld Lease payments is specified in "Attachment B" of the Lease as $10,174.15 per month, plus a 5% late charge for each unpaid installment, which is specified in Paragraph 4.A of the Lease.  Defendants' Ex. #4.  This amounts to $32,048.57 in damages to PGD as a result of Farmer Fresh's failure to make rent payments on the

warehouse.

### (2)  Alleged Failure to Properly Maintain the Warehouse

PGD also claims that Farmer Fresh breached the Lease by not making repairs to the warehouse roof, and by ignoring preventative maintenance as required under the Lease to the point that the warehouse is so deteriorated that PGD cannot rent it to interested Lessees.  PGD also claims that Farmer Fresh took certain warehouse fixtures belonging to PGD when it moved out of the warehouse in 2011.

With regard to the roof, PGD argues that "[Farmer Fresh] agreed to make repairs necessary to bring the warehouse up to standards that would be suitable for the storing of fresh and frozen products, including but not limited to, necessary repairs to the roof."  (Doc. 44, p. 9).  This wording actually puts some gloss on the actual language contained in the Lease, which states that "[Farmer Fresh] shall renovate and repair the existing building as agreed between the parties and deemed appropriate in order to conduct its business … [and] shall maintain and make necessary repairs to the interior elements and exterior of the Premises …" Defendants' Ex. #4, ¶ 14.

Paragraph 14 of the Lease is vaguely drafted and does not specify that there was a problem with the roof, what the problem with the roof was, what repairs were necessary, or what was meant by "renovation."  Nevertheless, the plain meaning of the phrase "make necessary repairs to the interior elements and exterior of the Premises" logically implies that Farmer Fresh was obligated to at least make some

26

repairs to the roof if it leaked.  Both Parr and Day testified that the warehouse roof leaked, with Day suggesting at trial that some repairs were in fact performed, i.e., Day testified that Boyanton "didn't fix the roof, he put a Band Aid over it so to speak."

Against this backdrop, the court finds that PGD has not met its burden of proving Farmer Fresh's nonperformance, i.e., that the repairs were not "as agreed between the parties" and cannot be "deemed appropriate in order to conduct business" as the Lease states.  Although Gilbert, Parr, and Day all testified that the roof was a necessary renovation, they provided no documentary evidence establishing the extent of repairs that were required, nor any documentary evidence that any of the parties were unable to conduct business out of the warehouse altogether.  The court also finds no evidence of an obligation on the part of Farmer Fresh to pay for a total replacement of the roof. . In fact, Day and Gilbert both admitted on cross-examination that no demand or promise was made in writing to replace the roof or to make a significant capital expenditure on roof repairs.

However, even if PGD could establish nonperformance by Farmer Fresh, the court finds that PGD did not establish its damages.  While there is no general requirement under Alabama law that proof of damages be in a particular form, the party seeking to prove damages must produce "sufficient evidence to allow the factfinder to calculate damages without basing its award on guesswork." Kearns v. Sealy, 496 F.Supp.2d 1306, 1321 (S.D. Ala. 2007) (quoting Livingston v. Tapscott, 585 So.2d 839, 841 (Ala. 1991)).  Here, the only evidence introduced by PGD on this

point is a self-serving list of alleged damages suffered between December 31, 2008

through February 8, 2011, which lists $215,937 for "Repair & Replacement Roof."

Defendant's Ex. #14.  PGD made no attempt to explain this amount, nor relate it to

Farmer Fresh's alleged shortcomings in repairing the roof.

For this same reason, the court finds that PGD has failed to prove its

damages with regard to warehouse maintenance and the allegedly missing fixtures.

The court is not inclined to credit the testimony of Parr, Gilbert, and Day without

additional documentary evidence which would establish that these dollar amounts

are more than just arbitrary and self-serving estimates.  PGD declined to submit

anything remotely along these lines, such as invoices, receipts, inspection reports,

photographs, or expert testimony about the condition of the property.  Additionally,

PGD offered no evidence regarding its efforts at finding a new tenant for the

warehouse.  Without this documentation, the list of damages contained in

Defendants' Exhibit #14 and the testimony of the PGD principals does not meet the

burden required for a party to prove the damages element of a breach of contract

claim.  See Nat Harrison Associates, Inc. v. Gulf StatesUtilities Co., 491 F.2d 578,

587 (5th Cir. 1974) ("the evidence must furnish data for a reasonably accurate

estimate of the amount of damages.") (quotations and citations omitted).

One exception to PGD's failure to prove damages concerns the metal racking

that PGD alleges Farmer Fresh took from the warehouse.  See Doc. 44 at 10-11.

Not only did Parr, Gilbert, and Day each testify that Farmer Fresh took metal

racking from the warehouse upon vacating the premises, but PGD offered into

evidence a January 20, 2011, email from Jim Nelson of Trammel Equipment Company, Inc.  Defendants' Ex. #10.  In his email and in his testimony at trial, Nelson stated that in 2005 he sold to PGD blue metal pallet racks and installed them at the warehouse. He further testified that he inspected the warehouse after Farmer Fresh moved out and saw that an entire row of the metal racks was missing, as were every steel support beam that he previously had installed.  Id. Nelson also stated that he subsequently went to the Farmer Fresh warehouse in Baldwin County, and saw the identical metal pallet racks installed there.  Nelson was able to confirm that these racks were the same by comparing stamps on the metal frames in Baldwin County with the racks that were previously installed in PGD's warehouse in Mobile.  Nelson also stated that the fact that the metal racks were blue indicated to him that the racks in Baldwin County were the same ones that he sold to PGD because he could not recall ever having seen other blue racks in his 30 years' experience selling warehouse equipment.  Finally, Nelson testified that the cost to replace and reinstall the metal racks in PGD's warehouse was $14,185.00.

Accordingly, Count Two of PGD's counterclaim is **GRANTED IN PART** with respect to Farmer Fresh's failure to make timely lease payments for the months of October, November, and December, 2009.  Thus, PGD is entitled to recover from Farmer Fresh the sum of $32,048.57, representing the three missed rent payments, plus the 5% late fee called for in the Lease.  Count Two of PGD's counterclaim is also **GRANTED IN PART** with regard to the missing metal pallet racks.  PGD is

therefore entitled to recover $14,185.00 from Farmer Fresh.  Count Two is
**DENIED** as to all other allegations.

### C.    COUNT THREE – Fraud

Lastly, the defendants claim that Farmer Fresh fraudulently induced them to
sign the Working Agreement by representing to them that it could store and deliver
food products in a safe and professional manner.  This count fails for the same
reason as Count Three of Farmer Fresh's Complaint.  The fact that Farmer Fresh
did not perform in accordance with the terms of the Working Agreement is not, by
itself, sufficient evidence of a fraudulent intent.  There was no evidence presented
by the defendants that, at the time the Working Agreement was signed, Farmer
Fresh had no intent to fully perform all of its obligations.  Without such evidence,
the defendants are not entitled to relief under this count.  Accordingly, Count Three
of PGD's counterclaim is **DENIED**.

### CONCLUSION

Count One of Farmer Fresh's complaint is **GRANTED**; however, the court
finds that the $32,194.04 in cold storage fees paid to Farmer Fresh by North 30
Food Sales should be deducted from the original $225,000 loan amount, as should
the $10,000 in cold storage fees that North 30 Food Sales would have paid to
Farmer Fresh from September through December 2010 had Boyanton not shut
down the freezer.  Accordingly, Farmer Fresh's damages under Count One are
reduced to $182,805.96.  Counts Two, Three, and Four of Farmer Fresh's complaint

are **DENIED.**

Counts One and Three of PGD's counterclaim are **DENIED**.  Count Two of the counterclaim is **GRANTED IN PART**. PGD is due to recover $32,048.57, representing three months of rental payments on the warehouse covering October, November, and December 2009, plus a 5% late charge as set forth in the Lease. Additionally, PGD is due to recover $14,185.00 for metal racks that Farmer Fresh took from the warehouse.

Accordingly, Farmer Fresh is due to recover damages of $136,572.39 from PGD.

**DONE** and **ORDERED** this 13th day of August, 2012.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE